# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

| | |
|---|---|
| **PAB BANKSHARES, INC.,** | : |
| Plaintiff, | : |
| v. | : Civil Action No. 7:05-cv-77(HL) |
| **MIKE JOHANNS, SECRETARY,** | : |
| **UNITED STATES DEPARTMENT** | : |
| **OF AGRICULTURE,** | : |
| Defendant. | : |

## ORDER

This matter is before the Court on cross Motions for Declaratory Judgment of Defendant United States Department of Agriculture (Doc. 18) and Plaintiff PAB Bankshares, Inc. (Doc. 19). The Court heard oral argument on the Motions on December 19, 2006. After consideration of the Motions and arguments of the parties, and for reasons more fully set forth below, the Court hereby grants the Motion of Defendant and denies the Motion of Plaintiff.

**I.  PROCEDURAL HISTORY**

In 1997, the predecessor bank of PAB Bankshares (hereinafter "the Bank") made a $5 million loan to Scientific Ag Industries, LLC ("Scientific Ag"). The loan was backed by a 90% guarantee from the United States Department of Agriculture ("USDA"), through its Business and Industry Guaranteed Loan Program. In July of 2001, Scientific Ag declared bankruptcy, without having repaid the loan to PAB Bankshares. The bankruptcy was dismissed in 2001. Thereafter, the Bank foreclosed on Scientific Ag, but Scientific Ag's assets were insufficient to satisfy the

loan amount. The Bank then sought payment of the loan amount from the USDA under its loan guarantee.

On November 4, 2003, the agency issued an adverse determination letter in which it declined to pay the Bank the guaranteed loan amount. The agency determined that the Bank had failed to comply with its responsibilities under the terms of the loan guarantee agreement. The Bank then requested that a National Appeals Division hearing officer review the agency's adverse determination. On October 22, 2004, the hearing officer issued a determination upholding the agency decision. The Bank then filed a request for Director Review. The National Appeals Division acknowledged receipt of the Agency's request for Director Review on November 30, 2004. The National Appeals Division Director issued a Director Review Determination on March 18, 2005. The Director upheld the hearing officer's determination that the agency had not erred. On July 13, 2005, the Bank filed the Complaint for Judicial Review at issue here.

## II.     JURISDICTION

In bringing its complaint, the Bank has premised jurisdiction on 7 U.S.C.A. § 6999, which provides that a final determination by the National Appeals Division of the USDA "shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5."[1] 7 U.S.C.A. § 6999 (West 1999). Section 6999 thus gives the Court jurisdiction to review the final determination of the USDA.

---

[1] Chapter 7 of Title 5 is commonly referred to as the Administrative Procedure Act. The relevant provisions are set forth at 5 U.S.C.A. §§ 701-706 (West 1996).

In addition to bringing its complaint pursuant to § 6999, the Bank has premised jurisdiction on 28 U.S.C. § 2201, the Declaratory Judgment Act. The form and venue provision of the Administrative Procedure Act identifies a declaratory judgment action as a proper vehicle for bringing a judicial review before the court in those situations where the statute permitting review does not specify the form that such proceeding should take, or where the statute is inadequate as to the form the proceeding should take. 5 U.S.C.A. § 703 (West 1996). Although § 6999 is a grant of jurisdiction to the district courts to review the final determinations of the USDA, it does not specify the procedural vehicle for getting agency action in front of the district courts for review. Therefore, this matter is properly before the Court as a declaratory judgement action.[2]

### III. STANDARD OF REVIEW

The procedures to be followed by the district court in reviewing federal agency action are set forth in the Administrative Procedure Act, as codified at Chapter 7 of Title 5 of the United States Code. 5 U.S.C.A. §§ 701-706 (West 1996). Section 706 of Title 5 defines the scope of review to be undertaken by a court reviewing federal agency action. Specifically, that Code Section provides, in part, that a reviewing court shall

---

[2] With regard to declaratory judgment actions, the Federal Rules of Civil Procedure provide that the "procedure for obtaining a declaratory judgment pursuant to Title 28, U.S.C., § 2201, shall be in accordance with these rules." Fed. R. Civ. P. 57. Thus, all of the procedures available to civil litigants under the Federal Rules, such as motions for summary judgment, were, in theory, available to the parties here. However, the parties elected to bring the matter before the Court on cross motions for declaratory judgment. This appears to be a widely accepted practice when obtaining review of agency actions. *See, e.g.,* Maden Tech Consulting Inc. v. United States, 74 Fed. Cl. 786 (Fed. Cl. 2006); New Orleans Found. v. United States, 70 Fed. Cl. 782 (Fed. Cl. 2006).

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be–
>
>> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> (B) contrary to constitutional right, power, privilege, or immunity;
>>
>> (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
>>
>> (D) without observance of procedure required by law;
>>
>> (E) unsupported by substantial evidence in a case subject to sections 556[3] and 557[4] of this title or otherwise reviewed on the record of an agency hearing provided by statute; or
>>
>> (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
>
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C.A. § 706 (West 1996) (footnotes added).

In its complaint, PAB Bankshares seeks, among other things, a determination that (1) the Director Review Determination is unsupported by substantial evidence and should be set aside pursuant to 5 U.S.C.A. § 706(2)(E) (Compl. ¶ 106); (2) the Director Review Determination is

---

[3] Section 556 of Title 7 sets forth the procedures to be followed when conducting hearings required by section 553 (Rule making) or section 554 (Adjudications) of Title 7. 5 U.S.C.A. § 556(a) (West 1996).

[4] Section 557 of Title 7 sets forth the procedures for initial decisions and subsequent review of hearings conducted in accordance with section 556 of Title 7. 5 U.S.C.A. § 557(a) (West 1996).

in excess of statutory jurisdiction and should be set aside pursuant to 5 U.S.C.A. § 706(2)(C) (Compl. ¶ 109); (3) the Director Review Determination is arbitrary, capricious, an abuse of discretion, and not in accordance with law, and should be set aside pursuant to 5 U.S.C.A. § 706(2)(A) (Compl. ¶ 109); and (4) the Director Review Determination was made without observance of procedure required by law and should be set aside pursuant to 5 U.S.C.A. § 706(2)(D) (Compl. ¶ 109). The Bank thus contends that the Court should review the Director's Determination under any of the foregoing standards. (Pl.'s Mem. Supp. at 19-21.)

While not specifically disagreeing with the Bank that the foregoing standards apply, the Government emphasizes that this is not a de novo proceeding but, rather, is to be conducted as a "record review." (Def.'s Mot. at 1.) The Government further contends, however, that the Bank "bears the burden of proof in showing, by a preponderance of the evidence, that the Agency's actions were clearly erroneous." (Def.'s Mot. at 8, citing 7 C.F.R. § 11.8(e).)

The Bank agrees with the Government that a de novo review is not proper. (Pl.'s Resp. at 1.) However, the Bank argues that the Government's reliance on 7 C.F.R. § 11.8(e) is erroneous. (Pl.'s Resp. at 2.) According to the Bank, the proper focus for this Court is whether the final determination of the Director of the National Appeals Division is supported by substantial evidence and whether that determination is arbitrary and capricious. (Pl.'s Resp. at 2-3.) The Government, on the other hand, maintains that "this action places the burden of proof upon the Plaintiff to show that the NAD Director erred in its decision." (Def.'s Reply at 3.)

In the Court's view, in the context of this case, the Government's use of the term "burden of proof" is somewhat erroneous. All parties agree that this is a record review. Thus, at this

5

stage of the litigation, there is no evidence to be put forward. Rather, the Court is charged with reviewing the record to determine whether the agency action should be set aside because it is unlawful for any one of the reasons set forth at 5 U.S.C.A. § 706.

Furthermore, the Court does not agree with the Government that § 11.8(e) directly controls the Bank's burden at this stage of the proceeding. Section 11.8(e) of Title 7 of the Code of Federal Regulations specifies the burden of proof that the appellant must meet when seeking to have an adverse agency determination reversed by the National Appeals Division. *See* 7 C.F.R. §§ 11.1 through 11.8 (2007). Specifically, under the subsection titled "Division hearings," the regulations state, "The appellant has the burden of proving that the adverse decision of the agency was erroneous by a preponderance of the evidence." 7 C.F.R. § 11.8(e) (2007). One of the things that the Court will consider in its review is whether the Bank, as the appellant before the National Appeals Division, met its burden of proving by a preponderance of the evidence that the adverse decision was erroneous, and whether the Director erred in concluding otherwise. But § 11.8(e) does not direct the parties' obligations before this Court.

As the complainant on this declaratory judgment action for agency review, the Bank has the burden of persuading the Court that the Director's Determination was unlawful. Thus, the Court's focus will be on whether the Bank has achieved this end.

## IV. DIRECTOR'S FAILURE TO PROVIDE A TIMELY DECISION

During the course of the agency appeal process, the Bank filed a request for Director Review. The National Appeals Division acknowledged receipt of the request for Director Review on November 30, 2004. The National Appeals Division Director issued a Director

Review Determination on March 18, 2005. However, the statute governing the Director's review procedures specifies that the Director "shall complete the review and either issue a final determination or remand the determination not later than . . . 30 business days after receipt of the request for review." 7 U.S.C.A. § 6998(b) (West 1999). The Bank contends that the Director's failure to issue a final determination within the requisite 30-day period served to violate its due process rights and, as a result, the Director's Determination should be held unlawful. (Pl.'s Mem. Supp. at 26.)

It is undisputed that the Director failed to complete the review and issue a final determination within the time provided by statute. Moreover, the language of the statute is unequivocal as to the Director's obligation to complete the review within 30 business days after receipt. However, the statute is silent as to what, if any, remedy is available to an appellant when the Director fails to comply with his obligations under the statute. Nor does the statute provide any consequences to the Agency should the Director fail to complete the review within the specified time.

Other courts faced with this issue have declined to impose a sanction for noncompliance. In <u>Beard v. Glickman</u>, 189 F. Supp. 2d 994 (C.D. Cal. 2001), for example, the district court declined to impose its own coercive sanctions in the absence of any direction from Congress that some punitive actions should be imposed. Relying on various cases decided by the Supreme Court of the United States, the court expressed that invalidating the Director's determination as a result of his failure to issue a timely determination would not be in the best interest of the public. <u>Beard</u>, 189 F. Supp. 2d at 1000.

In Passarell v. Glickman, No. 95-2122, 1997 WL 118407 (D.D.C. 1997), under circumstances similar to those in Beard, the district court found that the failure to issue a timely determination was arbitrary and capricious, as well as a violation of § 6998. In Passarell, the court remanded the case for a new hearing. The court did not, however, give appellants the relief they requested; the court refused to hold that appellants were automatically entitled to receive benefits as a result of the Director's failure to issue a decision within 30 days after the request for review was received. Id. at *3.

Here, the Court finds that the Director violated § 6998(b) when it failed to issue a final determination not later than 30 business days after receipt of the request for review. However, the Court also holds that the Director's failure to issue a timely final determination is not a basis for setting aside the agency decision. In declining to penalize the Director for his failure to comply with the statutory requirements, the Court acknowledges that as a general rule there should be consequences for failing to comply with statutory requirements. Certainly, litigants and members of the general public who fail to comply with statutory requirements often suffer the consequences of their failures, whether by being assessed penalties or having their claims foreclosed. And a case could be made that agencies should be treated no differently.

However, as the Supreme Court has recognized, the role of public agencies often sets them apart. Public agencies by their very nature represent the public interest and, as such, have a duty to protect both the public fisc and the integrity of the government programs they represent. Brock v. Pierce County, 476 U.S. 253, 259-60, 106 S. Ct. 1834, 1839 (1986). Thus, imposing sanctions on public agencies can have far-reaching consequences for the public they serve. In

Brock, for example, the Court concluded that agencies should not lose their power to act by virtue of their failure to act within the time limits imposed upon them by statute. Id. at 260, 106 S. Ct. at 1839. In reaching its result, the Court considered that imposing a penalty on the agency would prejudice the rights of the taxpaying public. Id. at 261, 106 S. Ct. at 1840. Likewise, in this case, granting the Bank the relief it seeks, and setting aside the agency determination solely because of the Director's failure to issue a timely determination, would have significant financial consequences that would impact the taxpaying public. Such a result would not be consistent with the Supreme Court's reasoning in Brock.

By not creating a remedy or a imposing a sanction arising from the Director's failure to comply with § 6998(b), Congress has created a statutory deadline that is of little or no meaning. Nevertheless, the problem is Congress's to fix, not the Court's. The Court holds that the Director's failure to issue a timely final determination is not a basis for setting aside the agency decision. As a result, the Court will address whether the Agency's decision was in error.

## V.  FINDINGS AND CONCLUSIONS

One of the Bank's key contentions in seeking to have the Agency determination set aside is that the Director of the National Appeals Division ignored the Bank's defenses when it upheld the hearing officer's ruling. To fully understand the Bank's argument, some background about the loan is necessary.

In May of 1995, Danny Day and Marshall Day started Scientific Ag. Through Scientific Ag, the Days intended to develop a new technology to create activated carbon by burning peanut hulls. In September of 1995, the Alternative Agricultural Research and Commercialization

Corporation ("AARCC") entered into a venture capital agreement with Scientific Ag. Under the terms of the agreement, AARCC invested $300,000 in Scientific Ag in return for 300 shares of common stock in the company. At the time AARCC invested in Scientific Ag, AARCC was a wholly-owned government corporation, a separate entity within the USDA. Its purpose was to support small rural businesses in their efforts to create new, non-food uses for crops or agricultural waste material. In 1997, AARCC and Scientific Ag amended their venture capital agreement, following which AARCC invested an additional $500,000 in the company, in return for royalties.

During the time that AARCC and Scientific Ag were fostering a relationship and refining their venture capital agreement, Scientific Ag filed an application for a $5 million Business and Industry ("B&I") Guaranteed Loan. The B&I Guaranteed Loan Program was operated by a unit of the USDA, the Rural Development Rural Business-Cooperative Service ("RBC Service"). In 2000, the USDA delegated authority to manage the venture capital arm–AARCC–to the RBC Service. However, during the years in question here, AARCC was operated outside the RBC Service, although both entities were under the umbrella of the USDA.

When Scientific Ag applied for the B&I loan, the RBC Service had an obligation to evaluate the loan application and determine, among other things, whether the borrower was eligible, whether the loan was for an eligible purpose, whether there was a reasonable assurance of repayment ability, and whether there was sufficient collateral and equity to support the loan. Once the B&I loan was approved, the RBC Service then issued a Conditional Commitment, which notified the lender of the conditions under which the Service would issue a Loan Note

10

Guarantee.

In this case, the Conditional Commitment was issued by the RBC Service on June 26, 1997. The RBC Service committed to a 90 percent guarantee on a $5 million loan. Without question, the guarantee was impacted by AARCC's involvement in the project, because the RBC Service and AARCC had a memorandum of understanding pursuant to which the RBC Service would provide a 90 percent guarantee for loans of up to $10 million for companies funded by AARCC, who also qualified for B&I loans. Here, Scientific Ag was a company funded by AARCC that also qualified for a B&I loan. As a result, it received the benefit of the 90 percent guarantee pursuant to the RBC Service and AARCC memorandum of understanding.

From the time AARCC began investing in Scientific Ag in 1995 until its final investment in 1999, AARCC had significant influence over how Scientific Ag progressed during the time that it was applying for the loan and thereafter. And, as the Bank argues, AARCC had its own due diligence and oversight obligations to meet in its dealings with Scientific Ag. As the Bank notes, and the USDA does not dispute, AARCC had various obligations before making its initial investment in Scientific Ag, such as a duty to consider the likelihood of the project's success, the impact of the project on the rural community, and the potential for the project to develop a new industry. In addition, applicants to AARCC were required to make several showings before they could even be considered for a project, such as showing that they had invested significant resources in the project, that they had a private source for matching funds, and they had in place an effective auditing and accountability system.

In view of AARCC's myriad obligations with respect to a research project such as that

11

undertaken in conjunction with Scientific Ag, its extensive involvement with Scientific Ag pursuant to the venture capital agreement, and its multiple investments in Scientific Ag, the Bank argues that the USDA, through its Rural Development Division, knew or should have known of all of the problems at Scientific Ag that now form the basis for the USDA's adverse determination. Moreover, the Bank contends that as to its guaranteed loan to Scientific Ag, "it was reasonable for PAB to draw substantial assurance from the Agency's due diligence investigation and knowledge of the borrower and its officers and investors." (Pl.'s Mem. Supp. at 14.) One of the Bank's key arguments in this appeal is that the "Director's Determination completely ignores the key role that AARCC . . . played in this loan." (Pl.'s Mem. Supp. at 21.) The Bank contends that the Director's Determination should have, but did not, "consider evidence of the Agency's conduct" as it pertained to the "Bank's defenses concerning the Agency's own negligence and its failure to comply with its own regulatory requirements." (Pl.'s Mem. Supp. at 22.)

It is reasonable to infer from the Director Review Determination that the Director considered the Bank's defenses as to the Agency's own negligence, as the Director had this to say:

> The applicable regulations describe a lender's duty to ensure that the regulatory requirements for making, securing, servicing, and collecting guaranteed loans are met. *See* 7 C.F.R. §§ 4287.101 and 4279.1. Loan making and servicing includes processing applications, developing and maintaining adequate documented loan files, recommending only loan proposals that are eligible and financially feasible, obtaining valid evidence of debt and collateral in accordance with sound lending practices, supervising construction, distribution of loan funds, servicing guaranteed loans in a prudent manner, following Agency's regulations, and obtaining Agency approvals or occurrence [sic] as required. *See* 7 C.F.R.

12

> § 4279.30(a). **The regulations do not support the proposition that a lender may shift any of these responsibilities to RBCS.[5] In other words, the lender's duty to properly service an account is independent of the knowledge or participation of RBCS in the loan process.**

(Case Rec. p. 3512.) (emphasis added) (footnote added). Clearly the Director considered the Bank's position that AARCC's involvement with Scientific Ag influenced how the Bank proceeded on its loan to Scientific Ag. However, the Director was not moved by the Bank's argument; nor is the Court.

The Court finds, as did the Director, that the Bank's duties in servicing the Scientific Ag loan operated independent of any obligations that AARCC might have had. The Bank made a business decision to rely on AARCC's involvement with respect to its own loan-making actions, but the Bank's business decisions to rely on AARCC do not provide a legal excuse for its failure to comply with its independent obligations on the loan. In other words, the Bank chose to abdicate its obligations by relying on AARCC but it cannot now use AARCC's decisions to avoid the consequences of its own decision making.

As noted by the Director, the issue to be determined in this case, "is whether RBCS followed its regulations in determining that a guarantee for a B&I loan was unenforceable

---

[5] The Bank also argues that this statement "turns the guarantee on its head" by making every loss the lender's fault. (Pl.'s Mem. Supp. at 23.) This statement misrepresents the situation, however. The Director is not referring here to all losses, only those resulting from negligent servicing because that is the situation under review. It might have been more accurate if the director had said that the regulations do not allow a lender to shift responsibility for losses *caused by negligent servicing* to the Agency, but it was not necessary since those were the kind of losses he was considering. The Bank's argument overlooks that the USDA's responsibility for loss only applies if the lender also fulfills its contractual responsibilities. The question to be decided here, to determine whether the USDA (specifically the RBC Service) has responsibility for the loss, is whether the Bank fulfilled its contractual responsibilities.

because losses were occasioned by Appellant's negligence in making and servicing the loan, and ensuring required security for the loan." (Case Rec. p. 3504.) Instead, the Bank would like the issue to be whether AARCC followed its regulations in dealing with Scientific Ag. However, as the Government notes in its response, the role that AARCC played, as a venture capital corporation, in Scientific Ag's development was very different from the role the Bank, as a lender, undertook when it agreed to service the loan to Scientific Ag. (Def.'s Resp. at 2.) AARCC's role, whether or not successful, was to assist in the development of new projects that might never get off the ground but for the assistance of AARCC. Certainly, AARCC had an obligation to follow its own regulations in determining how and with whom to invest but those regulations did not serve to make AARCC a guarantor as to the success of the companies with whom it did invest. More importantly, AARCC's regulations did not serve to allow lenders, such as the Bank, to abdicate their own responsibilities in servicing the B&I loans that they undertook. Thus, this Court finds, as did the Director, that neither AARCC's conduct nor its alleged lack of adherence to its own regulations provides a basis for excusing the Bank's failure to properly service the Scientific Ag account.

Additionally, the Court finds that the record supports the Director's Determination that the Bank was negligent in servicing the loan to Scientific Ag. In declining to pay the Bank the guaranteed loan amount, the RBC Service made five findings: 1) Scientific Ag improperly used $346,081 of loan funds to pay salaries, fees, and other compensation to corporate officers, stockholders, and family members; 2) Scientific Ag improperly used $478,217 of loan funds to make payments to four businesses owned by officials and stockholders of Scientific Ag or their

14

family members; 3) The Bank disbursed $346,612 in funds to Scientific Ag for ineligible and unsupported costs; 4) The Bank negligently permitted Scientific Ag's owner to design the production facility and to serve as the general contractor, which resulted in substantial delays and cost overruns so that project funds were exhausted before the facility was completed; and 5) The Bank failed to ensure that the value of collateral was sufficient to repay the loan. As a result of these findings, the USDA Rural Development office disallowed the full guarantee amount of $5,211,250 for negligent loan making and servicing.

Upon review of the case record, this Court finds that the conclusions of the RBC Service, as upheld by the Director, are supported by substantial evidence. Furthermore, the Director's determination is neither arbitrary nor capricious. There is sufficient evidence in the record to support a conclusion that Scientific Ag used loan funds to pay salaries–which was an unauthorized use of such funds. There is sufficient evidence in the record to support a conclusion that officials of Scientific Ag and their family members created for-profit businesses that were, in turn, paid with loan funds–which was not permitted under the terms of the Conditional Commitment. There is sufficient evidence in the record to support a conclusion that loan funds were used for purposes other than construction of the facility and purchase of equipment–in violation of the Conditional Commitment. Additionally, there is sufficient evidence in the record to support a finding that the Bank failed in its duty to properly oversee construction of the facility. Finally, there is sufficient evidence in the record to support a finding that the Bank failed to ensure that the loan was adequately secured.

## VI. CONCLUSION

After review of the record, the Court finds that the Director did not err in concluding that the Bank failed to show by a preponderance of the evidence that the Agency decision to deny the loss claim was wrong. Nothing offered by the Bank persuades the Court that the Director's Determination was unlawful. Thus, the relief sought by the Bank's Motion for Declaratory Judgment–that the Director's Determination be overturned–is hereby denied. Furthermore, the relief sought by the Government's Motion for Declaratory Judgment–that the Court rule in favor of Defendant on all issues–is granted. There being no other matters for determination, let judgment be entered for Defendant.

**SO ORDERED**, this the 26th day of March, 2007.

> *s/ Hugh Lawson*
> **HUGH LAWSON, JUDGE**

mls